Paul **CHEUNG** and Edmond
Cheung, Plaintiffs,

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Mark Tully, and Frank Sullivan, Defendants.**

No. 95 Civ. 5700 (LLS).

United States District Court,
S.D. New York.

Jan. 23, 1996.

Nahum A. Kianovsky, Vanessa A. Ploumis, P.C., New York City, for plaintiffs.

Jill L. Rosenberg, Orrick, Herrington & Sutcliffe, New York City, for defendants.

## Opinion and Order

STANTON, District Judge.

Defendants move pursuant to Fed.R.Civ.P. 12(b)(6) for dismissal of the complaint, which alleges that defendants refused to open an investment account for plaintiffs for unlawful discriminatory reasons.

### BACKGROUND

The complaint alleges the following:

Paul and Edmond Cheung, who are father and son, sought to open an investment account at Merrill Lynch's 200 Park Avenue office. They spoke by telephone with Mark Tully, a financial consultant at that office, and then met with him to discuss investment alternatives. The Cheungs told Tully that although they were not sure how they wanted to invest their money, they wanted to open an account at Merrill Lynch.

Tully told them their account was open but not yet active and that to activate their account they would only need to make a phone call. It was agreed that the Cheungs would tell Tully how they wished to invest the money. Tully assured the Cheungs that there were no obstacles—including Paul

Cheung's Canadian citizenship—which would prevent them from opening an account. (Complaint, ¶¶ 10–12.)

The Cheungs met with Tully again about a month later at the 200 Park Avenue office for the purpose of giving Tully a check for $100,-000 and telling him how they wanted to invest it. Tully left the conference room in which they were meeting to prepare power of attorney documents for the Cheungs' signature.

Frank Sullivan, the branch manager of the 200 Park Avenue office, entered the room. He "became hostile, and demanded that Plaintiffs state their business." He picked up Paul Cheung's Canadian passport and asked whether he was a Canadian citizen. Mr. Cheung answered affirmatively. Sullivan picked up the Cheungs' completed application, which had been signed at the earlier meeting, reviewed it, and left the room. (*Id.* ¶¶ 14–19.)

When Tully returned, he told the Cheungs that Sullivan had instructed him to terminate the meeting, and that the Cheungs would not be permitted to open an account with Merrill Lynch because they were not United States citizens. The Cheungs pointed out that Edmond Cheung was a U.S. citizen and that they could open the account under his name. After conferring again with Sullivan, Tully told the Cheungs that they could not open an account under Edmond's name because he hadn't been a citizen "long enough." Tully refused to discuss the matter further. The Cheungs left the office. (*Id.* ¶¶ 20–24.)

The Cheungs assert claims under 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), the New York City Administrative Code and New York common law. Paul Cheung claims defendants discriminated against him on the basis of his Canadian citizenship, race, sexual orientation and disability—specifically, defendants' perception that he was infected with the human immunodeficiency virus (HIV). Edmond Cheung claims defendants discriminated against him because they thought he was not a U.S. citizen and on the basis of his race and relationship to someone perceived to have a disability. Both assert claims under New York state law for intentional infliction of emotional distress.

## DISCUSSION

Defendants contend that particular types of discrimination are not prohibited by some of the statutes under which plaintiffs sue. With respect to the race discrimination claims, they urge that the complaint fails to set forth facts from which discriminatory motive can be inferred.

Defendants argue that the claims under the New York City Administrative Code must be dismissed because plaintiffs did not comply with that Code's pre-filing requirement.

Alternatively, defendants seek dismissal of all claims against Tully on the ground that the complaint alleges that he carried out others' instructions and thus himself lacked the necessary discriminatory motive.

In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Sheppard v. Beerman*, 18 F.3d 147, 150 (2nd Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994) (citations omitted).

## I.

### COVERAGE

A. *Section 1981*

Defendants argue that the Cheungs' citizenship discrimination claims are not cognizable under 42 U.S.C. section 1981. Section 1981 provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.... (c) The rights protected by this section are protected

against impairment by nongovernmental discrimination and impairment under color of State law.

Section 1981(c) was added by the Civil Rights Act of 1991, Pub.L. No. 102–166, § 101, 105 Stat. 1071 (1991), which applies to conduct occurring after the November 1991 effective date. *See Rivers v. Roadway Express,* —— U.S. ——, —— – ——, 114 S.Ct. 1510, 1519–20, 128 L.Ed.2d 274 (1994) (section 101 does not apply to preenactment conduct). The amended version applies to the Cheungs' section 1981 claim, which arose in December 1994.

█ It is settled law that section 1981 prohibits both public and private discrimination based on race. *See Runyon v. McCrary,* 427 U.S. 160, 173–74, 96 S.Ct. 2586, 2596, 49 L.Ed.2d 415 (1976). The Supreme Court has held that section 1981 also prohibits states from enacting laws which discriminate on the basis of citizenship. *See Takahashi v. Fish & Game Commission,* 334 U.S. 410, 419, 68 S.Ct. 1138, 1142–43, 92 L.Ed. 1478 (1948) (invalidating state statute barring persons ineligible for citizenship from obtaining commercial fishing licenses).

Neither the Supreme Court nor the Second Circuit has decided whether section 1981 (in its pre– or post–1991 form) prohibits private discrimination based on citizenship. Construing the pre–1991 version, the two courts of appeals which considered the question reached opposite results. *Compare Duane v. GEICO,* 37 F.3d 1036, 1042 (4th Cir.1994) (private discrimination prohibited) *with Bhandari v. First National Bank of Commerce,* 829 F.2d 1343, 1351–52 (5th Cir. 1987) (private discrimination not prohibited), *vacated,* 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989), *reinstated on remand,* 887 F.2d 609 (5th Cir.1989), *cert. denied,* 494 U.S. 1061, 110 S.Ct. 1539, 108 L.Ed.2d 778 (1990).

█ However, the enactment of section 1981(c) in 1991 mooted the arguments made in *Bhandari* and *Duane* over whether Congress, in enacting the provisions which later became present-day section 1981, meant to prohibit private citizenship discrimination. When Congress enacted section 1981(c), it was well-established that section 1981 prohibited public discrimination on the basis of citizenship.[1] Section 1981 does not exempt private citizenship discrimination from its coverage, nor is there evidence in the legislative history that Congress did not intend to prohibit private citizenship discrimination.

Accordingly, section 1981 must be construed to prohibit private discrimination on the basis of citizenship. .

### B.  *New York State Human Rights Law*

The Cheungs assert citizenship and race discrimination claims under the NYSHRL. Paul Cheung also claims that defendants discriminated against him on the basis of a perceived disability—HIV infection—and Edmond Cheung claims he was discriminated against because of his relationship to an HIV-infected person.

Specifically, the Cheungs rely on section 296(2)(a), which provides:

> It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, sex, or disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof. . . .

N.Y.Exec.L. § 296(2)(a).              .

Defendants, conceding for the purpose of this motion that Merrill Lynch may be a "public accommodation" under state and city law, (*see* Defendants' Reply Brief at 2, 9 n.

---

1. Although it is arguable that the Court's decision *Takahashi* was grounded in concern over state infringement of the federal immigration power, *see Takahashi,* 334 U.S. at 419, 68 S.Ct. at 1142 (The states "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and resi-

dence of aliens in the United States or the several states."), the Court squarely held that section 1981 "protect[s] 'all persons' against state legislation bearing unequally upon them either because of alienage or color." *Id.,* 334 U.S. at 419, 68 S.Ct. at 1143.

6), argue that the NYSHRL does not prohibit discrimination on the basis of citizenship.

Because section 296(2)(a) does not by its terms forbid discrimination on the basis of citizenship, the Cheungs' citizenship discrimination claims under that section must be dismissed unless the proscription against national origin discrimination encompasses discrimination against non-citizens.

No court has addressed that question in the NYSHRL context. The Supreme Court, interpreting Title VII's [2] proscription against employment discrimination on the basis of national origin, has held that discrimination on the basis of citizenship is not national origin discrimination. *See Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 95, 94 S.Ct. 334, 340, 38 L.Ed.2d 287 (1973). The Court defined national origin as "the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Id.,* 414 U.S. at 88, 94 S.Ct. at 336.

The reasoning in *Espinoza* applies with equal force to the NYSHRL. Citizenship and national origin are not the same: a U.S. citizen can be discriminated against on the basis of the country from which he or his ancestors came. Thus, it is not reasonable to infer that the New York legislature prohibited citizenship discrimination when it prohibited national origin citizenship.

Plaintiffs' citizenship discrimination claims under the NYSHRL are dismissed.

## II.

### SUFFICIENCY OF THE COMPLAINT

Contrary to defendants' assertion, the complaint sets forth facts from which intentional discrimination may be inferred. The complaint alleges that Tully permitted the Cheungs to open an investment account and was preparing to activate that account, despite Paul Cheung's Canadian citizenship. The Cheungs thus had reason to believe they had satisfied all objective requirements for opening an investment account. When Sullivan saw them, however, he allegedly became hostile, demanded that the Cheungs "state their business," and instructed Tully not to deal with them further. He also told the Cheungs, through Tully, that they could not open an account in Edmond Cheung's name because he hadn't been a citizen "long enough," despite Sullivan's alleged lack of knowledge about how and when Edmond Cheung became a U.S. citizen. Those allegations are sufficient to support an inference of discrimination; additional allegations sufficiently suggest the particular type.

The complaint alleges that defendants "perceived or believed" Paul Cheung was a homosexual. (*See* Complaint, ¶ 38.) Plaintiffs claim they can show that defendants knew Mr. Cheung was homosexual because of his "appearance, mannerisms, and other factors, along with certain societal stereotypes regarding homosexuals." (Plaintiffs' Memorandum at 17.) The alleged perception, together with the sequence of events which support an inference of discrimination, sufficiently states a claim for discrimination on the basis of sexual orientation. It is not beyond doubt that Paul Cheung "can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), so dismissal at this stage of the proceedings is not warranted.

The cases relied upon by defendants do not control here. In *Martin v. New York State Dep't of Mental Hygiene,* 588 F.2d 371, 372 (2nd Cir.1978), the plaintiff's "complaint stated only that the defendants had discriminated against him on the basis of race between August 1974 and June 1975 by denying him the authority, salary, and privileges commensurate with his position." Unlike the complaint here, the complaint in *Martin* did not set forth any facts suggesting discrimination.

And in *Yusuf v. Vassar College,* 827 F.Supp. 952, 955 (S.D.N.Y.1993), *aff'd in part,* 35 F.3d 709 (2nd Cir.1994), the complaint alleged that the plaintiff was a native and citizen of Bangladesh who was found

---

**2.** Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e–2.

guilty of sexual harassment and received a stiffer sentence than his white roommate, who had been found guilty of assault. The complaint conclusorily stated, "Race was a motivating factor behind the guilty verdict returned against plaintiff and the disparity in the sentence rendered in the two cases" but did not set forth facts supporting such an inference. The court of appeals, upholding the district court's dismissal, also noted that the complaint identified "a number of race-neutral factors that may have led" to the finding of guilt and the sentence. *See Yusuf,* 35 F.3d at 714.

## III.

## NEW YORK CITY ADMINISTRATIVE CODE—PRE–FILING REQUIREMENT

Title 8 of the New York City Administrative Code (the "NYCHRL") prohibits discrimination in public accommodations. *See* N.Y.C.Admin.Code. title 8, § 107(4) (1993).

■ Before commencing a civil action in court, a plaintiff suing under the NYCHRL must "serve a copy of the complaint upon the city commission on human rights and the corporation counsel." *Id.* § 502(c). Courts in this district have held that satisfying § 502(c)'s filing requirement is a prerequisite to suing under the NYCHRL. *See Monaco v. Lincoln Savings Bank,* 92 Civ. 7942, 1995 WL 66643 (S.D.N.Y. Feb. 17, 1995); *Walsh v. Lincoln Savings Bank,* 93 Civ. 1101, 1995 WL 66639 (S.D.N.Y. Feb. 17, 1995); *Paladines v. Poulos,* 93 Civ. 9031, 1994 WL 389022, 1994 U.S.Dist. LEXIS 10170 (S.D.N.Y. July 22 1994); *Dirschel v. Speck,* 94 Civ. 0502, 1994 WL 330262, at *5 n. 8 (S.D.N.Y. July 8, 1994) (compliance is a prerequisite but need not be alleged by plaintiff); *Lightfoot v. Union Carbide Corp.,* 92 Civ. 6411, 1994 WL 184670 (S.D.N.Y. May 12, 1994) (granting summary judgment for defendant on NYCHRL claim because plaintiff failed to prove compliance).

The Cheungs argue that they cannot be required to serve a copy of their complaint on the Corporation Counsel and Commission because that would force them to prosecute their claims through the city administrative process rather than in federal court. They cite section 502(a), which provides that "an aggrieved party shall have a cause of action in any court of competent jurisdiction ... unless such person has filed a complaint with the city commission on human rights." The Cheungs misapprehend section 502(c): it requires that the plaintiff serve, not file, a copy of his complaint with the city entities. In other words, it requires that a plaintiff give the city notice, but not that he institute proceedings with the city commission. Once he serves a copy of his complaint, a plaintiff may elect to proceed, as the Cheungs have, in federal court.

Accordingly, the Cheungs' claims under the New York City Administrative Code are dismissed, with leave to replead.

## IV.

## TULLY'S INDIVIDUAL LIABILITY

■ Defendants argue that Tully cannot be individually liable because he was directed to terminate the meeting with the Cheungs and to refuse to open an account for them. It is true that the complaint does not set forth facts from which one could infer that Tully intended to discriminate against the Cheungs; indeed, he had allegedly opened (although not activated) an account for them before Sullivan intervened. Because section 1981 bars only purposeful discrimination, *see General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982), the claims against Tully under that statute are dismissed.

■ By contrast, the NYSHRL provides, "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article...." N.Y.Exec.L. § 296(6). Tully thus may be liable if he aided Sullivan or Merrill Lynch or both in violating section 296(2)(a), even if he did not intend to discriminate against the Cheungs. For example, Tully's execution of Sullivan's allegedly discriminatory instructions may be considered aiding and abetting.

Citing *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 483 N.Y.S.2d 659, 473 N.E.2d 11 (Ct.App.1984), defendants also contend that Tully cannot be liable under section 296 because he does not have an ownership interest or any power to do more than carry out personnel decisions made by others. In *Patrowich,* the court held that a corporate officer is not an employer prohibited from discriminating by section 296(1). The *Patrowich* rule does not apply to claims under section 296(2)(a), which imposes liability not on employers, but on owners, agents and employees of public accommodations. It also does not limit liability for aiding and abetting under section 296(6). *See McIlwain v. Korbean Int'l Investment Corp.,* 896 F.Supp. 1373, 1382 (S.D.N.Y.1995) (*Patrowich* does not limit liability under 296(6) to owners and decisionmakers).

Plaintiffs' claims against Tully under section 1981 are dismissed, but not those under the NYSHRL (except as to citizenship).

## V.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 Defendants argue that the allegations in the complaint, even if true, do not rise to the level required to state a claim for intentional infliction of emotional distress. In *Murphy v. American Home Products,* 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86, 90 (Ct.App.1983), the court endorsed the standard set forth in the Restatement (2d) of Torts § 46 comment d, which requires that the conduct be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." The conduct alleged by Murphy—firing him in a humiliating manner because he disclosed accounting improprieties and doing so as a pretext for age discrimination—fell "far short" of the standard. *Id.; see also Wanamaker v. Columbian Rope Co.,* 740 F.Supp. 127, 138 (N.D.N.Y.1990) (complaint which alleged that plaintiff was humiliated and then fired by employer for discriminatory reasons did not state a claim for intentional infliction of emotional distress).

The allegations here do not rise higher than those in *Murphy* and *Wanamaker.* The claims for intentional infliction of emotional distress are dismissed.

### CONCLUSION

Defendants' motion is granted to the extent it seeks dismissal of (1) the citizenship discrimination claims under the New York State Human Rights Law, (2) the claims under section 1981 against Mark Tully, (3) the claims under the New York City Administrative Code and (4) the claims for intentional infliction of emotional distress.

In all other respects the motion is denied.

So ordered.